**NOT FOR PUBLICATION [24]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
ALAN A. POLONSKY,                   :
                                    :     Civil Action No. 09-4756 (FLW)
                    Plaintiff,      :
        v.                          :
                                    :          **OPINION**
VERIZON COMMUNICATIONS, CORP.,      :
                                    :
                    Defendant.      :
_____:

**WOLFSON, United States District Judge:**

Presently before the Court is a Motion for Summary Judgment by Defendant, Verizon Communications, Corp.[1] ("Defendant" or "Verizon"). This motion arises out of a Complaint filed by Plaintiff Alan A. Polonsky ("Plaintiff" or "Polonsky") related to the May 2009 termination of his employment with Verizon. Specifically, in his Complaint, Plaintiff alleges twelve causes of action related to his termination including: (1) Breach of Contract; (2) Violation of Employee Rights; (3) Denial of Corporate Due Process; (4) Willful and Wanton Conduct; (5) Conversion; (6) Wrongful Forfeiture; (7) CEPA; (8) Tortious Interference with Prospective Economic Advantage; (9) Tortious Interference With Contract; (10) Good Faith and Fair Dealing; (11) Defamation; and (12) Emotional Distress. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment in its entirety.

---

[1]The Court notes that Defendant was improperly pled as Verizon Communications Corp., and should, instead, be Verizon Corporate Services Corp.

## I.      BACKGROUND

### i.      Plaintiff's Employment

On or about November 15, 1994, Plaintiff entered into a three year employment contract with Telesector Resources Group, Inc. ("Telesector"), a predecessor corporation of Verizon. Defendants' Fact Statement ("DFS") ¶ 1; Plaintiff's Declaration in Opposition to DFS ("PD") ¶ 1.  Pursuant to the Telesector contract, Plaintiff accepted employment with Telesector commencing January 1, 1995 "for a period of three years."  DFS, Ex. A.  The Telesector contract provided that the "Employer may terminate Employee's employment hereunder at any time, for any or no reason, upon 30 days' written notice to Employee."  Id., § 5.  Moreover, the Telesector contract provided that the agreement "shall inure to the benefit of Employer's successors" and that "Employee agrees that Employer may assign this Agreement and grant its right hereunder in whole or in part to its successor. . . or to a corporation with which it may be merged, consolidated or combined. . . .provided that no such assignment shall be effective unless and until such assignee shall expressly assume all of Employer's obligations hereunder."  Id., § 10.

At the end of the three year period, Plaintiff's contract with Telesector expired, but Plaintiff's employment continued "without interruption and without any new written agreement, through a series of successor companies including Bell Atlantic, and various Verizon companies."  Plaintiff's Complaint ("Compl.") ¶ 2; DFS ¶ 9; PD ¶ 9.  Indeed, it is undisputed that following the expiration of the Telesector contract, Plaintiff did not receive a subsequent written contract of employment from Bell Atlantic, Verizon or any of Telesector's other successors.  DFS ¶ 8; PD ¶¶ 7,8.

Beginning, at the latest, in 2002, Plaintiff was employed by Verizon as a Director of

2

Sourcing.[2]  Reiken Decl., Ex. 9.  Plaintiff's 2002 performance review states that Plaintiff "had

an extremely solid performance in 2002 as he delivered on all of his major objectives."  Id.

However, the 2002 review also provides that Plaintiff "could be even more effective by slightly

tempering his results focus approach with a lighter/more open employee/customer/client

understanding.  He should continue to work on his listening/persuasion/influencing skills and

have a little more patience with others."  Id.

In 2004, Plaintiff's performance review noted that he "had difficulty with some customer

interaction this year," but that he had "made significant progress toward improvement in the

second half of 2004 by taking action on various recommendations made by his management."

Reiken Decl., Ex. 11.  Indeed, in August 2004, Plaintiff received a written warning from Richard

E. Potter, the Executive Director of the Strategic Sourcing group at Verizon, advising him that

his "interaction with coworkers can be perceived as unprofessional or intimidating" and

reminding him that one of his key responsibilities as a Director in Strategic Sourcing was to

ensure that  business is "carried out in a non-hostile and non-threatening manner."  Aron Decl.,

Ex. M.  Moreover, the warning noted that "it has become clear to me that on occasion your

behavior may not have consistently been in line with this responsibility . . . It is critical that in the

future you ensure your full compliance with the corporate policies around actions that can be

perceived as threatening, hostile or abusive in nature."  Id.

Thereafter in January 2005, George Dowell, a Verizon Vice President and one of

---

[2]The Court notes that neither party provided the Court with a chronology of Polonsky's
employment history.  Thus, the Court has attempted to piece together the above employment
history from exhibits incorporated in Defendant's motion for summary judgment as well as
Plaintiff's response thereto.

Plaintiff's supervisors, noted that although Plaintiff was among the "smartest" employees and that he had "lots of confidence in his judgment," he "has problems dealing with other [unreadable] – likes to rip someone's face off and watch them bleed. Gets almost violent."  Aron Decl, Ex. O.

Between July 2008 and May 2009, Verizon contends that various employees had complained to Dianne Provini, a Verizon Human Resources Business Partner, about Polonsky's abrasive and abusive management style.  DFS ¶ 58.  Indeed, Provini contends that she personally witnessed a "2-hour tirade in which Polonsky berated one particular employee."  Id.

Similarly, John Greer, a Director of Sourcing with Verizon, stated that he had witnessed numerous instances in which Plaintiff mistreated Verizon employees.  Greer Decl., ¶ 2.  Greer noted that during the 15 years that he had known and worked with Plaintiff, he found that Polonsky's "tactics forced many mature adults to cry, to be sick and to break down from stress." Id. ¶ 3.  Greer cited various examples of Plaintiff's mistreatment of Verizon employees including one incident involving an employee with over 30 years of service at Verizon and Bell Atlantic. Id. ¶ 4.  Specifically, Greer noted that Polonsky " aggressively pressured her through tactics of fear and intimidation. This escalated into a conflict between the two employees, and culminated in a meeting in which Polonsky directed me and another employee. . . . to read out a performance review to [the employee]citing the areas where she was not compliant."  Id. ¶ 5.  As a result of this tactic, the employee began shaking and trembling and, eventually, she "broke down in tears and moved from her chair to the floor on her hands and knees. Shaking and sobbing she pleaded with Polonsky, 'What do you want from me? Do you want me to bark like a dog?' Broken, she started barking and crying out, 'There you go, does that make you feel better, does that satisfy

you?'" Id.  Polonsky does not deny this incident.  Aron Decl, Ex. B., Polonsky Dep. 100-102.

Thereafter, on or around April 29, 2009, Plaintiff had a confrontation with Anali Coral, a junior level Verizon employee,  in which he insulted her work performance, interrupted her and yelled various insults at her including, "Nobody wants you! Open your eyes," "I bet no one has ever spoken to you this way; no one has ever been honest with you," and "People have tried to fire me! But they can't because I'm too honest. They can't live without my honesty, even though this is not the VZ way. They'll never get rid of me."  DFS ¶¶ 67, 68.  Coral reported this incident to Dianne Provini in Verizon's Human Resources Department and also discussed the incident with George Dowell.  Id. ¶ 69.

Subsequently, on May 20, 2009, Plaintiff was informed that his employment was being terminated for cause effective immediately.  Id. ¶ 72.   Thereafter, in August 2009, Plaintiff filed a complaint in the Superior Court of New Jersey, Somerset County alleging various causes of action related to his termination.  In or around September 15, 2009, Defendant removed the matter to this Court based on federal question jurisdiction.  In addition, Defendant filed an Answer and Counterclaim setting forth causes of action based on Plaintiff's alleged misconduct. Thereafter, Defendant filed the instant motion for summary judgment.


**ii.    Sarbanes-Oxley**

Between 2006 and 2007, following the passage of Sarbanes-Oxley, in his role as Director of Sourcing for Verizon, Plaintiff began to confront various issues regarding the bundling and unbundling of contracts.  Specifically, Plaintiff explained that in the past, when Verizon acquired goods and services pursuant to a bundled contract, add-ons such as "warranties, maintenance and

support, lab equipment [and] tooling that may get negotiated as part of long-term agreements" were subsumed within an overall contract price and not valued separately. DFS ¶ 75. Beginning in 2006 through 2007, the bundling of such goods resulted in accounting issues for sellers with whom Verizon contracted because "suppliers were not allowed to recognize the revenue" from bundled goods or services and therefore, "suppliers had been complaining to Verizon that Sarbanes Oxley was preventing them from recognized revenue on long-term agreements." Id. ¶ 77. In response to suppliers' concerns, Verizon implemented new policies between 2006 and 2007. DFS ¶¶ 78, 83; Aron Decl., Ex. B, Polonsky Dep. 198-201. Specifically, the Verizon accounting department had "laid out very specific guidelines relative to revenue recognition" which required "Accounting . . . to recognize the revenue and go back into those years relative to revenue recognition and account for the revenue." Id. ¶ 79; Aron Decl., Ex. B, Polonsky Dep. 206-207.[3]

As a result of these new policies, Plaintiff contends that he made "a global complaint about all the policies and procedures" governing accounting for elements of bundled contracts. Polonsky Dep. 313-315. Specifically, Plaintiff avers that he had complained to various individuals including his supervisors that "policies and procedures, numerous policies and procedures, extensive volumes of policies and procedures, were being produced, issued to

---

[3]The final outcome of Verizon's efforts was a Financial Policy issued by Verizon's Office of the Corporate Controller and effective as of March 31, 2008, entitled "Accounting for Multiple Element Procurement Arrangements and Incentives, Discounts or Other Considerations Received in Procurement Arrangements." ("VFP No. 32") Negri Decl. ¶ 4. Specifically, VFP No. 32 specifies the manner in which Verizon is "to account for a multiple procurement arrangement and how to account for incentives, discounts or other consideration Verizon receives related to a procurement arrangement." Id. ¶ 5. Further, VFP No. 32 provides that all elements of bundled contracts "shall be accounted for separately, if possible." Id. ¶ 6.

employees without the systems or the resources to implement."  Polonsky Dep., 313-314; see also Aron Decl., Ex. I at 433 ("I presented to Tanya Penny in Nov 2007 problems with Sarbanes Oxley on Bundled agreements.").   However, Plaintiff has not alleged that the implementation of these policies resulted in a misstatement in Verizon's annual audited financial statements.  DFS ¶ 84; Polonsky Dep. 208.  Moreover, Plaintiff has not identified any restatement of any financial disclosure by Verizon in connection with the accounting of elements of bundled contracts such as would occur if Verizon or its auditors considered any financial disclosure to be materially misstated.  DFS ¶ 93.  Indeed, Verizon obtained clean and unqualified auditors' opinions from Ernst & Young on its financial statements in each year relevant to Plaintiff's claims.  Id. ¶ 95. Finally, Plaintiff has not identified any provisions of Sarbanes Oxley that would be violated if vendors could not account for revenues earned from goods and services sold to Verizon in bundled contracts prior to implementation of accounting practices set forth in the policies of 2006 and 2007.  DFS ¶ 99.

On May 20, 2009, Plaintiff delivered a presentation entitled Contract Administration Project Update.  DFS ¶ 96.  Plaintiff contends that the presentation included information related to Verizon's alleged violations of Sarbanes-Oxley.  The Court notes, however, that upon a review of the presentation, the Court could find no reference to either Sarbanes-Oxley or the bundled contract accounting practices to which Plaintiff objected and that  were the subject of the policies adopted by Verizon in 2006 and 2007. DFS ¶¶ 96, 97; PD 97.  Instead, the only reference to compliance issues contained within the Presentation is a reference to 985 active insurance certificates tracked by computer out of some 10,000 suppliers and Verizon's continued reliance on paper records.  Reiken Decl, Ex. 20 at 9.  Moreover, Plaintiff has not identified any provision

of Sarbanes-Oxley that would be violated if Verizon relied upon paper copies of vendors'

insurance certificates rather than computerized records of these certificates.  DFS ¶ 98.


    iii.    <u>Verizon's Code of Conduct and the Corrective Action Toolkit</u>

    Importantly, Verizon maintains a Code of Conduct ("VCC") that memorializes the terms

and conditions of employment with Verizon, including Plaintiff's employment with Verizon.

Plaintiff expressly acknowledged his awareness and possession of the VCC.   PD ¶ 11; DFS ¶ 11.

Specifically, and in relevant part, the VCC establishes that it "applies to everyone who does

business for or on behalf of Verizon (for example: employees, interns, affiliates and in-house

contractors)."  Aron Decl., Ex. C.  Moreover, the VCC provides that "[f]ailure to comply with

any provision of this Code or company policy is a serious violation, and may result in

disciplinary action, up to and <u>including termination</u>, as well as civil or criminal charges."  <u>Id</u>.

(emphasis added).   Further, the VCC expressly states that it "is not an employment contract.

Adherence to the standards of the Code of Conduct is a condition of continued employment.

This Code does not give you rights of any kind, and may be changed by the company at any time

without notice.  Unless governed by a collective bargaining agreement, <u>employment with Veizon</u>

<u>is 'at will,' which means that you or Verizon may terminate your employment for any reason or</u>

<u>no reason, with or without notice, at any time</u>.  This at-will employment relationship may not be

modified except in a written agreement signed by the employee and an authorized representative

of Verizon."  <u>Id</u>.(emphasis added).

    In addition, and in relevant part, the VCC expressly states that "Verizon will not tolerate

any threatening, hostile or abusive behavior by employees in the workplace, while operating

8

company vehicles or on company business." Aron Decl., Ex. C at 4. Moreover, the VCC states

that employees must avoid conflicts of interest to ensure that they "make sound, impartial and

objective decisions on behalf of the company." Id. at 8. Indeed, the VCC states that all potential

or actual conflicts must be reported to the VZ Ethics and EEO GuideLine. Id. Finally, the VCC

requires Verizon employees to safeguard confidential and proprietary documents, business plans,

and information. Aron Decl., Ex. C. at 13-14.

In addition to the VCC, Verizon maintains a Corrective Action Guideline Toolkit

("CAGT") that it provides to Verizon supervisors to help them to manage "effective ways to

deliver difficult messages on disciplinary topics and to impose consequences up to and including

termination of employment." Def's Rep. at 6; Reiken Decl., Ex. 1. The CAGT expressly

provides, in relevant part, that Verizon employees may be terminated from employment for

"[v]iolating the Verizon Code of Business Conduct . . . [m]istreating, abusing, threatening or

intimidating other employees, customers, visitors and other people who do business with

Verizon. . .[ and] the unauthorized possession of Verizon property." Id. It is undisputed that

Plaintiff had a copy of the CAGT. Reiken Decl, Ex. 1.

       iv.   Plaintiff's Benefits

At the time of his termination in May 2009, Plaintiff earned a salary of $174,000, plus

various other short and long term incentives. According to Plaintiff, the annual Short term

incentives (STI) comprised approximately $67,000, while the long term incentives included

annual Performance Stock Units (PSUs) and annual Restricted Stock Units (RSUs), totaling

approximately $130,000 per year, as well as various employer contributions to Plaintiff's 401(k).

Compl. ¶ 4.  At the time of his termination, Plaintiff contends that he had unvested PSUs and RSUs that would have vested on January 2, 2010, January 2, 2011 and January 2, 2012 and whose value, at the time of termination, was approximately $400,000.  Id. ¶ 6.

Importantly, the Performance Stock Units ("PSUs") to which Plaintiff alleges he is entitled are governed by the terms and conditions set forth in Verizon's Long-Term Incentive Plan, Performance Stock Unit Agreements ("LTI Plans").  DFS ¶ 22.  The LTI Plans expressly provide that the grant of PSUs do not constitute a contract of employment between Verizon and the participant.  Aron Decl., Ex. D., ¶ 14.  In addition, the LTI Plans require separating employees to return Verizon property immediately upon the termination of employment.  DFS ¶ 25; Aron Decl., Ex. D.  Specifically, the LTI Plans provide that "You agree that on or before termination of your employment for any reason with the company . . . you shall return to the Company all property owned by the Company . . . including files, documents, data and records." Aron Decl., Ex. D.  Further, a participant's failure to comply with any of the obligations set forth in the LTI Plans, "shall result in the Participant's immediate forfeiture of all rights and benefits, including all PSUs . . . under this agreement."  Aron Decl., Ex. D.

On April 14, 2010, nearly a year after his termination, Plaintiff emailed certain Verizon employees regarding his termination and attached various Verizon documents to the email.  As a result, on or around April 26, 2010, counsel for Verizon wrote to Plaintiff's counsel to demand that Plaintiff return to Verizon all documents and copies of such documents that he retained following his termination.  Aron Decl., Ex. T.  Plaintiff failed to do so and, instead, retained copies of the relevant Verizon documents.  Aron Decl., Ex. B. Pp. 351-355; Aron Decl., Exs. C & D.  In June 2010, Verizon again objected to Plaintiff's continued retention of Verizon

10

documents.  Aron Decl., Ex. T.  As a result of Plaintiff's allegedly unauthorized retention of these documents, Verizon filed an Amended Counterclaim seeking to rescind any long-term incentives otherwise due to Plaintiff in light of Plaintiff's allegedly unlawful retention and dissemination of proprietary Verizon documents.  DFS ¶ 38.

Subsequently, in January 2011, Plaintiff produced, through counsel, a log of Verizon documents that he had retained and failed to return to Verizon upon termination of his employment.  Aron Decl., Ex. E.  The log includes business documents as well as documents related to Plaintiff's employment and termination.  Id.; see, e.g., Aron Decl., Exs. F-H (attaching certain documents contained in Plaintiff's production log that were labeled "Proprietary and Confidential").


v.      Plaintiff's Current Employment

Subsequent to the termination of his employment at Verizon, in or around September 2010, Plaintiff obtained employment with Motorola Solutions, Inc. DFS ¶ 100; PD ¶ 100. However, during his deposition, Plaintiff averred that his job search was hampered by Verizon employees.  Specifically, Plaintiff stated that he interviewed with Thomson Technicolor and that "Verizon sourcing individuals. . . .specifically told him not to hire me."  Polonsky Dep. 429:15-20.  In addition, Plaintiff stated that many of his contacts "had been spoken to" and, as a result, refused to help him find a job.  Polonsky Dep. 434:14-15.  Plaintiff also testified that he received a phone call from the Vice-President of Tellabs who advised that he was not going to help Plaintiff get a job because "they do hundreds of millions of dollars [of business] with Verizon."  Id. 434:5-12.  In addition, Plaintiff testified that there "was a lot of rumor" concerning his

termination which affected his ability to find subsequent employment.  Polonsky Dep., 446:16-18, 448:10.

## II.      STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the

nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'"  Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).


III.    ANALYSIS

As discussed above, Plaintiff's Complaint sets forth twelve causes of action related to his employment with, and termination from, Verizon.  In this motion, Defendant moves for summary judgment on each Count of the Plaintiff's Complaint.  In support of this motion, Defendant attaches a Statement of Material Facts as well as numerous exhibits including the Telesector

Employment Agreement, portions of Plaintiff's deposition testimony, the Verizon Code of Conduct, the LTI Plan, the log of documents retained by Plaintiff, and other relevant documents. Plaintiff filed a brief in Opposition to Defendant's Motion and attached various relevant exhibits as well as a declaration by Plaintiff in Opposition to Defendant's Statement of Material Facts. The Court notes, however, that Plaintiff has not responded to Defendant's argument point by point based on the Complaint and, instead, has replied to Defendant's arguments in a more global fashion. That said, the Court has attempted to discern from the Complaint, as well as from Plaintiff's opposition to the instant motion and the exhibits attached thereto, Plaintiff's strongest responses to each of Defendant's arguments.

To the extent the Court has been able to discern the relevant factual allegations and connect them to Plaintiff's numerous causes of actions, it appears that Count I (Breach of Contract), Count II (Violation of Employee Rights), Count III (Denial of Corporate Due Process), Count IV (Willful and Wanton Conduct), Count IX (Tortious Interference with Contract) and Count X (Good Faith and Fair Dealing) set forth causes of action related to Defendant's alleged breach of Plaintiff's employment contract. In addition, Count V (Conversion) and Count VI (Wrongful Forfeiture) appear related to various benefits allegedly conferred upon Plaintiff by Defendant. Finally, Count VII sets forth a cause of action under the New Jersey Conscientious Employee Protection Act ("CEPA), Count VIII sets forth a cause of action for Tortious Interference with Prospective Economic Advantage, Count XI sets forth a cause of action for Defamation and Count XII sets forth a cause of action for Emotional Distress. The Court will consider each of Plaintiff's claims in turn.

1.      **Plaintiff's Contract Claims (Counts I, II, III, IV, IX and X)**

In the instant motion, Defendant contends that it is entitled to summary judgment on Plaintiff's contract-related claims because Plaintiff was an employee-at-will with Verizon and, as such, he could be terminated at any time with or without cause.

In New Jersey, employment is presumptively at-will, meaning that an employer may terminate an employee "for good reason, bad reason, or no reason at all. An employment relationship remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise." Witkowski v. Thomas J. Lipton Inc., 136 N.J. 385, 397 (1994) (internal citations omitted).   However, the presumption that an employee serves at the will of the employer may be overridden by an agreement to the contrary.  Id.

Initially, to the extent that Plaintiff has alleged a cause of action sounding in contract based on the Telesector Employment Agreement, the Court finds that such allegations are entirely unsupported by the record.  Indeed, it is undisputed that the Telesector Employment Agreement was of limited duration – three years– and that Plaintiff did not receive a written employment contract from Verizon or any other Telesector successor.  DFS ¶ 8; PD ¶¶ 7,8. Moreover, although the Telesector contract provided that Telesector "may assign" the contract to a successor if it "expressly assume[s] all of Employer's obligations hereunder," Plaintiff has proffered no evidence whatsoever that any of Telesector's successors, including Verizon, agreed to assume the obligations set forth in Plaintiff's Telesector employment agreement.  Thus, Verizon was not bound by any of the provisions relating to termination that were contained within the Telesector Employment Agreement, and, to the extent that any of Plaintiff's allegations are dependent upon the Telesector Employment Agreement, the Court finds that

summary judgment for Defendant is warranted.

Moreover, to the extent that Plaintiff has alleged a contractual cause of action based on the VCC, the Court finds such causes of action to be untenable.   As discussed above, a presumption that an employee serves at the will of the employer may be overridden by an agreement to the contrary, including from a widely distributed employment manual that articulates terms and conditions of employment, including grounds and procedures for termination.  Id.  To state a claim for breach of an implied contract created by an employment manual, a plaintiff must point to some language in the manual that contains "an express or implied promise concerning the terms and conditions of employment." Witkowsi, 136 N.J. at 393.  To determine whether an employment manual creates contractual obligations, a court should consider whether a fair reading of the manual gives rise to the reasonable expectations of employees that "certain benefits are an incident of the employment (including, especially, job security provisions)."  Id. at 392 (quotations omitted).  Factors relevant to whether a manual gives rise to the reasonable expectation of employer obligations include the "definiteness and comprehensiveness of the termination policy and the context of the manual's preparation and distribution."  Id.

However, an employer can disclaim language that implies a contractual obligation by placing a clear, prominent disclaimer in its employee handbook.  Witkowski, 136 N.J. at 400.  The purpose of an effective disclaimer is to put an employee on notice "that she or he is employed only at will and subject to termination without cause." Nicosia, 136 N.J. at 412.  To determine the adequacy of a disclaimer, New Jersey courts consider the clarity and prominence of the disclaimer.  Id. at 413. The clarity requirement addresses whether the disclaimer indicates

the manual was not intended to create a binding obligation.  See id. The prominence requirement addresses the placement of the disclaimer in the manual and likelihood an employee's attention would be drawn to the disclaimer.  Id.

Initially, the Court notes that Plaintiff has pointed to no language whatsoever within the VCC that could be read as creating an express or implied promise concerning the terms and conditions of Plaintiff's employment.  To the contrary, the VCC specifically includes a disclaimer stating that the VCC was "not an employment contract" and that the VCC "does not give you rights of any kind, and may be changed by the company at any time without notice." Aron Decl, Ex. C at 3.  Moreover, the disclaimer provides that "employment with Verizon is 'at will,' which means that you or Verizon may terminate your employment for any reason or no reason, with or without notice, at any time.  This at-will employment relationship may not be modified except in a written agreement signed by the employee and an authorized representative of Verizon."  Id.(emphasis added).  Thus, the Court finds that the VCC did not confer any contractual or due process rights upon Plaintiff and, to the extent that any of Plaintiff's contract-related claims are dependent upon the VCC, the Court finds that summary judgment for the Defendant is warranted.

Finally, to the extent that Plaintiff has alleged a contractual cause of action based on the CAGT, the Court finds these claims to be similarly untenable.  Initially, the Court notes that unlike the VCC which was widely distributed to all employees, and which expressly states that the "Code of Conduct applies to everyone who does business for or on behalf of Verizon," the CAGT appears to have only been provided  to supervisors to help them "identify issues and determine who to contact when allegations of unethical conduct, Company policy or Compliance

violations occur." Reiken Decl., Ex. 1 at 2. Thus, it does not appear that the CAGT was intended as a widely distributed document containing any promises regarding employment or the conditions of employment. Indeed, Plaintiff has cited no language from the CAGT that could be read as creating a promise concerning employment or the terms and conditions of Plaintiff's employment. At best, the CAGT provides that "[s]upervisors <u>may</u> conduct investigations of misconduct in some cases." Reiken Decl., Ex. 1 at 2 (emphasis added). Moreover, while the CAGT enumerates certain reasons for termination, it expressly provides that such reasons "may be included in the termination letter <u>but are not limited to</u>..." <u>Id</u>. at 4. Thus, the Court finds that a fair reading of the CAGT does not give rise to the reasonable expectation that "certain benefits are an incident of the employment" as required to form an implied employment contract under New Jersey law. <u>Witkowsi</u>, 136 N.J. at 393.

For these reasons, the Court finds that Plaintiff was an employee at will with Verizon and, therefore, that Plaintiff had no contractual right to continued employment or due process prior to his termination. As a result, the Court grants summary judgment to Defendant on Plaintiff's contract-related claims set forth in Count I (Breach of Contract), Count II (Violation of Employee Rights), Count III (Denial of Corporate Due Process), Count IV (Willful and Wanton Conduct), Count IX (Tortious Interference with Contract) and Count X (Good Faith and Fair Dealing).

### 2.    <u>Plaintiff's CEPA Claim (Count VII)</u>

Count VII of Plaintiff's Complaint sets forth a cause of action under CEPA. Specifically, Plaintiff alleges that Defendant terminated him in retaliation for complaining about Verizon's

alleged violations of Sarbanes-Oxley.  In this motion, Defendant argues that Plaintiff has not

established a prima facie case under CEPA or met his burden of rebutting Verizon's preferred

reason for his termination.  As a result, Defendant argues that summary judgment is warranted on

Count VII.[4]  The Court agrees.

CEPA was enacted "to protect and encourage employees to report illegal or unethical

workplace activities and to discourage public and private sector employees from engaging" in

such activity. Abbamont, 138 N.J. 405, 431 (1994); see also Barratt v. Cushman & Wakefield,

144 N.J. 120, 127 (1996); Higgins v. Pascack Valley Hospital, 158 N.J. 404, 417(1999).  CEPA

provides, in relevant part, that:

> [a]n employer shall not take any retaliatory action against an employee because

_____

[4]In addition, Defendant argues that by setting forth a CEPA cause of action, Plaintiff has waived his common law claims relating to his termination.  CEPA expressly provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8.  "The causes of action that fall within this waiver provision are those causes of action that are directly related to the employee's termination due to disclosure of the employer's wrongdoing." Falco v. Community Medical Center, 296 N.J.Super. 298, 318 (App.Div.1997) overruled on other grounds by Dzwonar v. McDevitt, 177 N.J. 451, 463 (2003) (quoting Young v. Schering Corp., 275 N.J.Super. 221, 238 (App.Div.1994)), aff'd 141 N.J. 16 (1995) (dismissing claims for retaliatory discharge, constitutional tort, negligent infliction of emotional stress, intentional infliction of emotional stress, and discharge in violation of public policy as waived by plaintiff's assertion of a CEPA claim).  On the other hand, causes of action that are "substantially independent" from the CEPA claims are not waived by institution of a CEPA action.  See Young, 141 N.J. at 29, 33. The question is whether the other claims require different proofs from those required to sustain a CEPA claim.  See id. at 30-31.  Because the Court has determined that summary judgment is warranted on substantive grounds set forth infra and supra on Counts I, II, III, IV, V, VI and X, the Court need not consider whether Plaintiff's assertion of a CEPA retaliatory discharge claim resulted in a waiver of the claims that substantially relate to Plaintiff's termination and forfeiture of employment benefits.

the employee does any of the following: a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ... (2) is fraudulent or criminal . . .or c. Objects to or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law [;] ...(2) is fraudulent or criminal; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. § 34:19-3.

To succeed on a CEPA claim, a plaintiff must prove four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action.  See Kolb, 320 N.J.Super. at 476, 727 A.2d 525; Dzwonar, 177 N.J. at 462. At base, CEPA covers employee complaints about activities the employee reasonably believes are: (i) in violation of specific statute or regulation; (ii) fraudulent or criminal; or (iii) incompatible with policies concerning public health, safety or welfare or the protection of the environment. See Estate of Roach, 164 N.J. at 610.  Importantly, "CEPA does not require that the activity complained of . . . be an actual violation of a law or regulation, only that the employee "reasonably believes" that to be the case."  Id. at 613.

Once a plaintiff has established a prima facie case under CEPA, courts employ the well-established burden-shifting analysis that is used in federal discrimination cases involving "pretext" claims.  Blackburn v. United Parcel Services, Inc., 179 F.3d 81, 92 (3d Cir. 1999). Under this test, "the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its actions."  Woodson v. Scott Paper Co., 109 F.3d 913, 920 n. 2

20

(3d Cir.) (quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).  Once the defendant articulates a legitimate reason for the adverse employment action, the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the plaintiff.  <u>See id.</u>  Then, "[t]o prevail at trial, the plaintiff must convince the factfinder 'both that the reason [given by the employer] was false, and that [retaliation] was the real reason.'"  <u>Id</u>. (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)).  For summary judgment purposes, the court must determine whether the plaintiff has offered sufficient evidence for a reasonable jury to find that the employer's proffered reason for the discharge was pretextual and that retaliation for the whistleblowing was the real reason for the discharge.  <u>See Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 728 (3d Cir.1995) ("[T]o defeat a summary judgment motion based on a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence.").  Typically, the types of evidence that the plaintiff must point to are "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons."  <u>Id</u>. at 731.

In the instant matter, Plaintiff appears to allege that his whistle-blowing activity comprised making a "global complaint about all the policies and procedures" related to bundled contract accounting every time Verizon issued a new policy or procedure related to such accounting, Polonsky Dep. 313-315, as well as his disclosure in a May 2009 presentation of material allegedly related to Sarbanes-Oxley.  However, Plaintiff has not cited any specific provisions of Sarbanes-Oxley that he believes were violated nor has he identified a restatement of any financial disclosure by Verizon in connection with the accounting of elements of bundled

contracts such as would occur if Verizon or its auditors considered any of the financial disclosures to be materially misstated.  DFS ¶ 93.[5]  Thus, Plaintiff has not met his prima facie burden to establish his reasonable belief that Verizon's policies relating to bundled contract accounting violated Sarbanes-Oxley.

However, even assuming that Plaintiff has met the first prong of the CEPA test, the Court finds that Plaintiff has not met the causation prong of the test.  In that regard, the Court looks to the chronology of events related to the Plaintiff's alleged whistle-blowing complaints that Plaintiff contends resulted in his termination.  Plaintiff alleges that Verizon fired him in retaliation for complaining about Sarbanes-Oxley violations in a May 20, 2009 presentation. However, as stated herein, a review of the presentation does not reflect any highlighting of, or commenting upon, Sarbanes-Oxley violations.  In addition, this allegation is belied by the fact that Plaintiff has also averred that he continuously complained about Sarbanes-Oxley beginning in 2006 and 2007.  If, indeed, Verizon was retaliating against Plaintiff for complaining about alleged violations of Sarbanes-Oxley, then why did Verizon wait two or three years to terminate Plaintiff?  Plaintiff has provided no explanation for this timeline nor has he pointed to any violations of Sarbanes-Oxley within his 2009 presentation.  For these reasons, the Court finds that Plaintiff has not established a prima facie case under CEPA.

However, even assuming that Plaintiff did meet his prima facie burden under CEPA, Plaintiff has not proffered a single shred of evidence that Verizon's proffered explanation for his termination – Plaintiff's hostile and abusive behavior towards other Verizon employees – is

---

[5]Moreover, it is undisputed that Verizon obtained clean and unqualified auditors' opinions from Ernst & Young on its financial statements in each year relevant to Plaintiff's claims.

unworthy of credence.  Indeed, other than the unsupported and conclusory allegation that

Verizon's stated reason for Plaintiff's termination was "pretextual," Pl's Rep. Br. at 9, 20,

Plaintiff has not provided an explanation for how or why Verizon's stated reason was pretextual

nor has he pointed to any "inconsistencies or anomalies that could support an inference that the

employer did not act for its stated reasons."  Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d

Cir.1995).  Indeed, the record is replete with complaints by co-workers regarding Plaintiff's

abusive demeanor and the detrimental impact it had on them.  For these reasons, the Court will

grant summary judgment to Defendant on Plaintiff's CEPA claim.

### 3.    Plaintiff's Benefits Claims (Counts V and VI)

In addition, Defendant argues that it is entitled to summary judgment on Plaintiff's

benefits-related claims since Plaintiff was terminated for cause and because he failed to return

Verizon documents upon his termination in violation of the VCC and the Plan governing

Plaintiff's benefits.   Specifically, Counts V and VI of the Complaint appear to allege that but for

Plaintiff's termination with cause from Verizon, certain of his unvested Stock Units would have

eventually vested according to the three-year schedule set forth in the LTI Plans.  Compl. ¶¶ 4-8;

Counts V and VI.   In the instant motion, Defendant contends that it is entitled to summary

judgment on Plaintiff's benefits-related claims since Plaintiff, essentially, forfeited his rights to

his PSUs by being terminated with cause and by retaining proprietary and confidential Verizon

documents in violation of the LTI plans and the VCC.  For the same reasons, Defendant contends

that it is entitled to summary judgment on its counterclaim, i.e., that because of Plaintiff's

misconduct – i.e. retaining Verizon documents in violation of the LTI Plans – Plaintiff forfeited

his rights to the stock units and other incentives governed by the LTI Plans.  For the reasons set forth below, the Court agrees and will grant summary judgment to Defendant on Plaintiff's benefits claims and Defendant's counterclaim.

Initially, the Court notes that Exhibit A to the LTI Plans expressly provides that upon termination "for any reason . . . you shall return to the company all property owned by the Company, . . .  including files, documents, data and records."  Aron Decl, Ex. D.  Further, the LTI Plans state, in relevant part, that if a Participant breaches any obligation, including those set forth in Exhibit A, the Participant shall immediately forfeit "all rights and benefits, including all PSUs and DEUs, under this Agreement."  Id. ¶ 26(g).

Applied here, the record is clear that Plaintiff retained Verizon documents following his termination.  Indeed, in April 2010, Plaintiff emailed various Verizon documents to Verizon employees.  Aron Decl, Ex. T.  Moreover, in January 2011, counsel for Plaintiff produced a log of Verizon documents that Plaintiff had retained upon termination of his employment.  Aron Decl., Ex. E.  The log includes documents related to Plaintiff's employment and termination as well as numerous business-related documents marked "Proprietary and Confidential."  Aron Decl., Exs. F-H.  Thus, the Court notes that this is not the type of situation where a party retains documents solely related to his employment; instead, it is undisputed that Plaintiff retained corporate Verizon documents marked "Confidential and Proprietary."  Aron Decl., Exs., E-H. As a result, the Court finds that there is no question of material fact as to whether Plaintiff has retained documents in violation of the LTI Plans and, therefore, that he is subject to the penalties set forth in the LTI Plans including the "immediate forfeiture of all rights and benefits, including all PSUs....under this Agreement."  Aron Decl., Ex. D. ¶ 26(g).

Moreover, to the extent that Plaintiff attempts to argue that there is an issue of material fact as to whether he was terminated properly, and, therefore, that he is entitled to a jury trial on the issue of whether he is entitled to the benefits set forth in the LTI Plans, the Court does not agree. Initially, to the extent that Plaintiff suggests that he was improperly terminated based on alleged whistleblowing activities under CEPA, the Court has already determined that Plaintiff has neither established a prima facie case under CEPA nor has he proffered any evidence to suggest that Verizon's explanation for his termination was unworthy of credence. See supra section III (2). Moreover, as discussed above, Plaintiff has not demonstrated the existence of a written contract that governed his employment with Verizon; thus, Plaintiff was an employee at will with Verizon. As a result, Plaintiff has not established that he was terminated improperly or that he had a contractual right to employment such that he was qualified for benefits under the LT Plans.

Further, the Court notes that the VCC expressly states that "Verizon will not tolerate any threatening, hostile or abusive behavior by employees in the workplace." Aron Decl, Ex. C. at 4. In addition, the VCC provides that it "is not an employment contract. Adherence to the standards of the Code of Conduct is a condition of continued employment." Id. at 3. Similarly, the CAGT expressly provides that Verizon employees may be terminated for violating the VCC or for "mistreating, abusing, threatening or intimidating other employees." Reiken Decl, Ex. 1. In this context, the record before this Court makes plain that throughout his employment, Plaintiff engaged in a series of acts that violated the terms of the VCC and CAGT. For example, several of Plaintiff's performance reviews note that Plaintiff had difficulties interacting with employees and customers. See, e.g., Reiken Decl., Exs. 9, 11. Indeed, in 2004, Plaintiff was issued a

written warning concerning his "unprofessional" and "intimidating" interactions with coworkers and reminding Plaintiff that he had to perform his role in a "non-hostile and non-threatening manner." Aron Decl, Ex. M. Moreover, the record reveals at least two uncontested instances in which Plaintiff harassed and intimated junior employees, the last of which occurred in April 2009 and, ultimately, led to Plaintiff's termination. See, e.g., Greer Decl.; DFS ¶¶ 67, 68. For these reasons, the Court finds that Plaintiff could be terminated for cause under the VCC in connection with his threatening or hostile behavior or for "mistreating, abusing, threatening or intimidating other employees" under the CAGT. As a result of his termination with cause, Plaintiff was required to return to Verizon "all property owned by the Company, . . . including files, documents, data and records" or forfeit the benefits, including unvested Stock Units, under the LTI Plans. Aron Decl, Ex. D. Because it is undisputed that Plaintiff retained not just personal documents related to his employment, but corporate Verizon documents labeled "Confidental and Proprietary" in violation of the LTI Plans, the Court will grant summary judgment to Verizon on Plaintiff's benefits-related claims (Count V and Count VI) as well as on Verizon's benefits-related counterclaim.

### 4. Tortious Interference with Prospective Economic Advantage (Count VIII)

Count VIII sets forth a claim for Tortious Interference with Prospective Economic Advantage. The Supreme Court of New Jersey has identified four elements of a prima facie case for this tort: (1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with "malice," (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages. Printing Mart-Morristown v. Sharp Elecs. Corp.,

116 N.J. 739 (1989).

In the instant matter, the Court finds that Plaintiff has not established any of the elements of a tortious interference claim.  Indeed, the Court notes that Count VIII comprises two paragraphs– the first merely incorporates the prior allegations contained in the Complaint while the second only avers that "Defendant tortiously interfered with plaintiff's prospective economic advantage to plaintiff's great prejudice."  Compl. at 12.  Thus, based on Plaintiff's pleading, the Court does not understand the ways in which Plaintiff believes that Defendant tortiously interfered with his prospective economic advantage.  Moreover, the Court notes that Plaintiff has not addressed Defendant's arguments with respect to Count VIII in its opposition brief.  Thus, the Court is at a loss to understand which factual allegations allegedly support Plaintiff's claim that Defendant interfered with his prospective economic advantage.

That said, for the sake of completeness, the Court notes that to the extent that Plaintiff's allegations in Count VIII related to an employment contract or benefits derived therefrom, I have already determined that Plaintiff has not established the existence a contractual right to employment.  Moreover, to the extent that Count VIII is based on damages suffered from losing his unvested stock, I have already ruled that by breaching the provisions of the LTI Plans, Plaintiff relinquished any right to his unvested stock units.  Further, to the extent that Count VIII is somehow related to Plaintiff's inability to find employment immediately upon his termination, on the record before me, Plaintiff has neither identified nor established that he had a reasonable expectation of economic advantage arising from his future employment, nor has he established that such expectation was interfered with intentionally and with malice, nor has Plaintiff identified or established actual damages as a result of such interference.  For these reasons, the

Court will grant summary judgment to Verizon on Count VIII.

### 5.    Defamation (Count XI)

Count XI sets forth a claim for Defamation in which Plaintiff alleges that Defendant defamed him "by besmirching his reputation and good name, mischaracterizing plaintiff's employment performance and falsely charging him with wrongdoing when none existed, terminating him for cause when none existed" and that Defendant "published" this defamation to Verizon employees, Verizon customers and the industry in general which prevented Plaintiff from obtaining employment.  Compl. at 13.  In this motion, Defendant argues that summary judgment is warranted on Plaintiff's defamation claim because Plaintiff has not alleged, let alone established, a prima facie case of defamation.  The Court agrees.

"Defamation imposes liability for publication of false statements that injure the reputation of another."  Printing Mart–Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 765 (1989) (citing Maressa v. N.J. Monthly, 89 N.J. 176, 190 (1982)). "In order to establish a prima facie case of defamation ... a plaintiff must show that defendant communicated to a third person a false statement about plaintiff that tended to harm [the] plaintiff's reputation in the eyes of the community or to cause others to avoid plaintiff."  W.J.A. v. DA., 416 N.J.Super. 380, 384–85 (App.Div.2010) (quoting McLaughlin v. Rosanio, 331 N.J.Super. 303, 312 (App.Div.2000)).  As the New Jersey Supreme Court has explained, the threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning.  Decker v. Princeton Packet, Inc., 116 N.J. 418 (1989); see Romaine v. Kallinger, 109 N.J. 282, 290 (1988).

Initially, the Court notes that Plaintiff has identified no allegedly defamatory statements

made by Defendant to support his claim for defamation.  Indeed, the only allegedly defamatory statements identified in the record amount to the following: (1) Plaintiff's deposition testimony that he was told by Francois Rossiensky of Thomson Technicolor that unidentified Verizon sourcing individuals "told him not to hire me."  Polonsky Dep. 429:15-20; (2) Plaintiff's testimony that some of his contacts "had been spoken to" and that he was not hired as a result.  Polonsky Dep.  434:5; and (3) that there were "a lot of rumor[s]" concerning Plaintiff's termination.  Polonosky Dep. 446:16-18, 448:10.  Because Plaintiff has only asserted speculative and non-specific statements made by unidentified parties, Plaintiff cannot establish a claim for defamation under New Jersey law and the Court will grant summary judgment to Defendant on Count XI.

### 6. Emotional Distress (Count XII)

Finally, Count XII sets forth a claim for Emotional Distress.  Specifically, Plaintiff alleges that Verizon caused him "great harm and emotional distress by terminating him without cause or due process and by holding him up to public humiliation."  Compl. at 13.  The Court disagrees and will grant summary judgment to Defendant.

To state a claim for intentional infliction of emotional distress, a plaintiff must establish: (1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe.  Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366 (1988); Horvath v. Rimtec Corp., 102 F. Supp.2d 219, 235 (D.N.J.2000).  To establish extreme and outrageous conduct, a plaintiff must show conduct "'so outrageous in character, and so extreme

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Buckley,111 N.J. at 366 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  The Court notes that "the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct."  Fregara v. Jet Aviation Bus. Jets, 764 F.Supp. 940, 956 (D.N.J.1991) (quoting Cautilli v. G.A.F. Corp., 531 F.Supp. 71, 74 (E.D.Pa.1982)).

Moreover, courts have consistently recognized that it is particularly difficult to establish intentional infliction of emotional distress in the employment context. See, e.g., Horvath, 102 F.Supp. 2d at 235; Fregara, 764 F. Supp. at 956.  As the court in Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15 (App. Div. 2001), held, "[e]xcept for the kind of aggravated discriminatory conduct involved in [Taylor v. Metzger, 152 N.J. 490(1998) ], 'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'"  Id. at 297 (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir.1988)).  In Taylor, the New Jersey Supreme Court determined that "the power dynamics of the workplace contribute[d] to the extremity and the outrageousness of [the] defendant's conduct," and, as a result, held that a supervisor's use of a racial slur presented a triable issue of intentional infliction of emotional distress. 706 A.2d at 695.

To the extent that the Court can discern any facts related to Plaintiff's alleged claim for intentional infliction of emotional distress, Plaintiff appears to be suggesting that his termination as well as the difficulty he encountered in finding subsequent employment form a basis for Count XII.  Specifically, at his deposition, Plaintiff testified that his emotional distress claim is based on

his "incapacitat[ion] from the date of my termination till about September.  Couldn't put resumes

together. Didn't have access to my contact lists.  People were told not to speak to me. Didn't

have access to my files."  Polonsky Dep. 449-450.  Initially, the Court notes that as discussed

throughout this opinion, Plaintiff was an at-will employee who was terminated properly for cause

by Verizon.  Thus, to the extent that Plaintiff relies on his termination in support of his claim for

intentional infliction of emotional distress, such reliance is inapposite.  See, e.g., Griffin, 337

N.J. Super. at 23-24 ("'[W]hile loss of employment is unfortunate and unquestionably causes

hardship, often severe, it is a common event' and cannot provide a basis for recovery for

infliction of emotional distress.")(quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d

Cir.1988)(internal quotations omitted)).  Moreover, Plaintiff has pointed to no intentional and

outrageous conduct on behalf of Defendant that would rise to the level required to set forth a

claim for emotional distress.  Id. at 23 (explaining that "[c]onduct has been found sufficiently

outrageous to support a claim for intentional infliction of emotional distress when a landlord

failed to provide central heating, running water and reasonable security in a rent controlled

building in an effort to induce the tenants to vacate . . .; when a doctor allegedly told a child's

parents that he was "suffering from a rare disease which may be cancerous knowing that the child

has nothing more than a mildly infected appendix . . .; and when an employer referred to an

African American employee as a "jungle bunny" . . . On the other hand, our courts have rejected

intentional infliction of emotional distress claims based on an employer's alleged denial of

promotions and ultimate termination of an employee based on his age . . ; a police department's

demand that an officer undergo a "fitness for duty" examination, which included drug testing and

psychological evaluation, as a condition of returning to work after a domestic violence incident . .

.and a wife's eleven year adulterous affair with her boss. . .").   Finally, to the extent that Plaintiff relies on his subsequent  inability to put a resume together or access his contact list or files to support this claim, such distress does not amount to the level of distress required to establish a claim for emotional distress under New Jersey law.  Id. at 26 (To establish the distress element of an intentional infliction of emotional distress claim, a plaintiff must show a "'severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.'")(quotations and citations omitted).  In the absence of any of these factors, the Court will grant summary judgment to Defendant on this count.


### IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment on all counts is **GRANTED**.


Dated: November 22, 2011                        /s/ Freda L. Wolfson
                                                Freda L. Wolfson, U.S.D.J.

.